UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WINIFRED EGAN AND JENNIFER DUNKLIN-DORAZIO,<br><br>*Plaintiff*,<br><br>v.<br><br>REGENERON PHARMACEUTICALS INC., MITCHELL MARTIN, INC., VINCENT CANTARELLA, INDIVIDUALLY, AND ELLEN STIEVE, INDIVIDUALLY,<br><br>*Defendants*. | Civil Action No. 22-cv-1981(PGS)<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on Defendants' joint motions to dismiss the complaint and to compel arbitration. (ECFs 11 and 12). Oral argument was held on December 7, 2022. The Court has federal question jurisdiction under 28 U.S.C. § 1331 since Plaintiffs assert a claim under Federal Labor Standards Act. 29 U.S.C. § 201.

This case arises from an employment dispute among Plaintiffs Winifred Egan ("Egan") and Jennifer Dunklin-Dorazio ("Dunklin-Dorazio") and Defendants Mitchell Martin, Inc. ("MMI") (Plaintiffs' employer); Ellen Stieve ("Stieve") (manager and/or director at MMI); Regeneron Pharmaceuticals Inc. ("Regeneron") (MMI's client); and Vincent Cantarella ("Cantarella") (manager at Defendant Regeneron). (ECF 1, Exhibit A at ¶¶ 1-55). The complaint alleges

1

Defendants violated the New Jersey Wage and Hour Law ("NJWHL"), N.J.S.A. 34:1 1-56a et seq.; the New Jersey Wage Payment Law ("NJWPL"), N.J.S.A. § 34:11-4.1 et seq.; and the Fair Labor Standards Act ("FLSA"). *Id.* at ¶¶ 223-244. Further, Plaintiffs allegedly suffered retaliation in violation of the FLSA; and the Paid Sick Leave Law (PSLL). *Id.* at ¶¶ 91, 233-264.

Although the Plaintiffs filed a single complaint and Plaintiffs characterize MMI and Regeneron as "Joint Employers," the analysis of each Plaintiff's causes of action are treated separately. Despite many overlapping facts, there are different facts, causes of action and damages.

I.

Egan Facts

Egan is a New Jersey resident. (ECF No. 1, Exhibit A, Complaint at ¶¶ 49-51). Egan was employed by MMI as a Program Manager to perform technical services for its client, Regeneron, from March 18, 2019 through March 19, 2021. (ECF No. 1, Exhibit A Complaint. at ¶ 50; ECF No. 11-3 at 11; ECF No. 11-2 at 11). Egan worked on-site at Regeneron's Basking Ridge, New Jersey location three to four days per week until March 2020. (ECF No. 1, Exhibit A, Complaint at ¶¶ 60-61). Thereafter, she worked exclusively from her home in New Jersey because of the COVID shutdown. *Id.*

MMI is a staffing agency providing its clients with information technology services. *Id.* at ¶ 28. MMI is incorporated in New York with a principal place of business in Manhattan, and a location in Woodbridge, New Jersey. *Id.* at ¶¶ 19-21. Defendant Regeneron is incorporated in New York with a principal place of business in Tarrytown, New York and a location in Basking Ridge, New Jersey. *Id.* at ¶¶ 7-9.

Egan and MMI executed an Employee Services Agreement ("Egan Agreement") that includes a mediation and arbitration paragraph (discussed below). (ECF No. 11-3). Regeneron is mentioned in the Egan Agreement but is not a party thereto.

The complaint alleges Stieve, a manager at MMI, informed Egan that she would rarely be required to work overtime; but if she worked overtime, she would be appropriately compensated. (ECF No. 1, Exhibit A, Complaint at ¶ 82). Regeneron's representative Cantarella allegedly required Egan to work many overtime hours without compensation and directed Egan not to record such hours on her timesheets. *Id*. at ¶¶ 83-88. Moreover, Cantarella warned her that if such hours were recorded, the timesheet would be rejected and would not be paid by MMI and Regeneron. *Id*. Egan estimated that she worked 703 unpaid overtime hours on Regeneron work. *Id*. at ¶ 98. Egan alleges she complained to Stieve

regarding the unpaid overtime, and lack of sick leave while working at the Regeneron location, but no assistance was offered by Stieve. *Id*. at ¶ 106.

At some point, Egan requested paid sick leave due to a heart condition, and she informed her coworkers of their rights to sick leave. *Id*. at ¶¶ 117-218. Evidently, this spurred others to request sick leave pursuant to PSLL. *Id*. at ¶¶ 217-218. Egan alleges MMI and Regeneron blamed her for the additional requests. *Id*. at ¶¶ 217-220. In addition, Egan recorded and submitted overtime hours. As a result, Cantarella informed MMI that Egan submitted incorrect timesheets related to her sick leave and overtime hours. In response, Egan was eventually fired. *Id*. at ¶¶ 122-144.

Egan alleges that Regeneron discriminated and harassed her due her absence for her heart condition. *Id*. at ¶¶ 117-218. She further alleges that Regeneron and MMI (a) forced her to work significant overtime hours during her recuperation period, and required her to maintain a strict deadline schedule without consideration of her recuperation; (b) denied her excused compensation time to attend follow-up doctor's appointments; and (c) interrogated her about her alleged incorrect timesheets related to her leave. *Id.* at ¶¶ 117-146.

Egan alleges that MMI and Regeneron were joint employers because both exercised control over (1) rules and conditions of employment including those involving hiring, firing and discipline; (2) issuing work assignments to plaintiffs

4

and (3) supervising plaintiffs' day-to-day activities. *Id.* at ¶¶ 71-74. Further, Egan alleges that both Cantarella and Stieve were actively involved in managing the day-to-day operations of Regeneron and MMI. *Id*. at ¶¶ 33-44.  Cantarella and Stieve had power over personnel decisions, including hiring and firing, setting wages and otherwise had control over terms and conditions of employment. *Id*. at ¶¶ 32-42.  Moreover, Cantarella and Stieve determined whether employees were paid for all hours worked, including overtime.  *Id*. at ¶¶  33-43.

      As noted above, Egan and MMI entered into the Egan Agreement. (ECF No. 11-3, at 1-4; *See also* ECF No. 1, Exhibit A at ¶ 58).  The Egan Agreement is signed by both parties on the last page, and each individual page is initialed at the bottom by Egan and a representative of MMI. (ECF No. 11-3, ¶¶ 1-12). As previously noted, Regeneron is not a signatory to the Egan Agreement.

      The Egan Agreement incorporates 21 paragraphs plus a term sheet. The pertinent paragraphs are highlighted below:

      1)    The term sheet identifies Regeneron as the client of MMI, and Egan was assigned to Regeneron's Basking Ridge, New Jersey facility.  It also includes her pay rate ($100.00 per hour). (ECF No. 11-3, p. 11-14).

      2)    The Resolution of Disputes Mediation/Arbitration (Paragraph 17) is at issue herein.  Egan and MMI agreed that all employment disputes "arising out of this [Egan] Agreement or performance of services" shall be submitted to mediation

and arbitration (ECF No. 11-3, p. 7-8). In addition, paragraph 17 requires that each party must (1) initiate a claim within 15 days of the event; (2) waive a right to a jury trial; and (3) waive the right to sue for punitive and exemplary damages. *Id.* In another subsection, there is a choice of law provision wherein the Egan Agreement is governed by the laws of New York with a "deference to federal law," and should be "conducted [in accord with] the Federal Arbitration Act." *Id*. Finally, there is a poorly drafted non-severability clause based on the interpretation of the Egan Agreement may provide that if any provision of Paragraph 17, as a whole, is deemed unenforceable, then Paragraph 17 cannot be enforced.

II.

"The Third Circuit has established a two-tiered framework for assessing motions to compel arbitration." *Lloyd v. Retail Equation, Inc*., No. CV 21-17057, 2022 WL 18024204 at *4 (D.N.J. Dec. 29, 2022); *See Guidotti v. Legal Helpers Debt Resolution, L.L.C*., 716 F.3d 764, 776 (3d Cir. 2013). "Where it is apparent on the face of the complaint, or in documents relied upon in the complaint, that the claims at issue in the case are subject to arbitration, the case is considered pursuant to the motion to dismiss standard as applied under Fed. R. Civ. P. 12(b)(6)." *Guidotti,* 716 F.3d 774-76 (2013) (citing *Somerset Consulting, LLC v. United Capital Lenders, LLC,* 832 F.Supp.2d 474, 482 (E.D.Pa.2011). "If the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if

the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then 'the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question.'" *Id.* After limited discovery, the court may entertain a renewed motion to compel arbitration under a summary judgment standard (Fed. R. Civ. P. 56). *Id.* Here, the Court proceeds on the motion to dismiss standard.

### III.

"The "principal purpose" of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (citing *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)).

Under Section 3 of the FAA, a party may apply to a federal court for a stay of the trial of an action "upon any issue referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3. Therefore, the Court may compel a party to arbitrate where it failed to comply with an agreement to arbitrate, and to stay proceedings in any matter subject to arbitration. *Romanov v. Microsoft Corp.*, No. CV 21-03564, 2021 WL 3486938, at *3 (D.N.J. Aug. 9, 2021) (citing 9 U.S.C. §§ 2-4). Thus, there are two questions in determining this motion to compel: (1) whether a valid agreement to arbitrate exists; and (2) whether the dispute at issue

falls within the scope of the agreement. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009) (citing *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir.2009) and *China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 281 (3d Cir. 2003).

"Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations." *Concepcion,* 563 U.S. 333, 351 (2011). *See*, *Rent–A–Center, West*, *Inc. v. Jackson*, 561 U.S. 63, 67 – 69 (2010). The FAA policy "is to ensure that private agreements to arbitrate are enforced according to their terms." *Concepcion,* 563 U.S. 333, 344 (2011) (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). As such, the private agreement controls as to the issues subject to the arbitration. *Rosenberg v. Hotel Connections*, Civ. 21-4876, 2022 WL 7534445*6 (D.N.J. Oct, 13, 2022). This is a two-step process where one must find (a) that a valid contract exists; and (2) the dispute falls within the scope of the contract. *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). Both prongs rely on the existence of a contract.

The Third Circuit found that "[t]he federal policy encouraging recourse to arbitration requires federal courts to look first to the relevant state law of contracts . . . in deciding whether an arbitration agreement is valid under the FAA." *Spinetti*

*v. Serv. Corp. Int'l*, 324 F.3d 212, 214 (3d Cir. 2003). In this case, Paragraph 17 indicates that the law of New York applies; but Egan lives and works in New Jersey, so New Jersey law may apply. Since the law of both states promotes arbitration as a means to resolve employment disputes, a conflict of law does not exist. As such, under the Egan Agreement, the parties (Egan and MMI) are subject to arbitration. *Compare*, *Westinghouse Elec. Corp. v. New York City Transit Auth.*, 82 N.Y.2d 47, 603 N.Y.S.2d 404, 407, 623 N.E.2d 531 (1993) *with Martindale v. Sandvik*, 173 N.J. 76, 85 (2002). Both states follow similar contract formation principles (evidence of an (1) offer; (2) acceptance; (3) mutual assent to the terms of an agreement with reasonably certain terms; (4) intent to be bound and, (5) consideration). (*Compare* N.J. Jury Instr. Civ. 4.10C*; GMAC Mortgage, LLC v. Willoughby,* 230 N.J. 172, 185 (2017) *with Kolchins v. Evolution Mkts., Inc.,* 8 N.Y.S.3d 1, 9 (1st Dep't 2015), aff'd, 73 N.Y.S.3d 519 (2018)). Both states similarly require the parties' clear, explicit, and unequivocal agreement to arbitrate. *Compare*, *Atalese v. U.S. Legal Servs. Grp., L.P.*, 219 N.J. 430, 433 (N.J. 2014) with *Matter of Fiveco, Inc. v. Haber*, 11 N.Y.3d 140, 144, 863 N.Y.S.2d 391, 893 N.E.2d 807 (2008). MMI and Egan have admitted that the Egan Agreement exists (ECF No. 11-2 at p. 9-10 ¶¶ 5-10; ECF No. 1, Exhibit A ¶ 58), in fact Egan relies on the existence of the employment contract in its underlying complaint (ECF No. 1, Exhibit A ¶ 58). The Egan Agreement is therefore enforceable under either state

9

law.  Ordinarily, both states would uphold the contractual choice of arbitration if it does not violate public policy.  *Rosenberg*, 2022 WL 7534445 *3 (October 13, 2022).  Here, the law of both states is very similar, so no conflict of law exists. Once there is a private agreement containing an arbitration clause, as agreed to by the parties, one must determine if there are issues of public policy which may undermine that decision.

The question that arises is which entity -- the Court or the arbitrator, properly decides public policy issues.  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (citing *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964).  In recent years, the courts have crystalized the process for determining questions about the "making of the agreement to arbitrate." *MXM Construction Company, Inc. v. New Jersey Builders Laborers Statewide Benefit Funds*, 974 F.3d 386, 392 (3d Cir. 2020). Such issues are for the courts to decide "unless the parties have clearly and unmistakably referred those issues to arbitration in a written contract *whose formation is not in issue*." *Id.* (emphasis added).  *See*, 9 U.S.C. § 4. Here, neither party is questioning the validity of the underlying Egan Agreement nor is there any attack on the breadth of the delegation provision. (ECF No. 18,  p. 9 at ¶14) (see also ECF No. 18, p. 15-26).

"Generally, '[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract [and] . . . possesses no power

10

to decide the arbitrability issue.'" *Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*, 192 A.D.3d 540, 541, 140 N.Y.S.3d 699 (1st Dep't 2021) (quoting *Henry Schein, Inc. v Archer & White Sales, Inc.,* 139 S Ct 524, 529 (2019)). In order to delegate an arbitrability question to an arbitrator, there must be clear and unmistakable evidence that the parties agreed to do so. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944-945 (1995).

Here, the Egan Agreement provides that the parties agreed to arbitrate "any and all disputes, claims or controversies arising out of or relating to this Agreement or the performances of services thereunder." (ECF No. 11-3, p. 7 at ¶ 17). This is clear and broad language that the parties delegated to the arbitrator the authority to decide any and all threshold issues. Where the Egan Agreement is broadly worded to require the submission of "all disputes" to the arbitrator, the question of arbitrability inures to the arbitrator. *Shaw Grp., Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003). Accordingly, the parties intended the arbitrator to decide the questions of unconscionability, adhesion and public policy. Parenthetically, the arbitrator may resolve any violation of any public policy issue by either severing the provision or declining to arbitrate the entire matter.

IV.

The Dunklin-Dorazio facts are similar to Egan. Dunklin-Dorazio entered an Employment Services Agreement. The Egan Agreement and the Dunklin-Dorazio

11

agreement are the same. (ECF No. 1, Exhibit A Complaint at ¶¶ 49-51). Dunklin-Dorazio was hired as a Clinical PM by MMI and was assigned to Regeneron on March 12, 2018 and continues to be employed there. (ECF No. 1, Exhibit A Complaint.at ¶ 52; ECF No. 11-3 at 23). Dunklin-Dorazio worked at Regeneron's Tarrytown, New York office 1-3 days a week until March 2020, when due to the pandemic, she worked (and continues to work) exclusively from home in New Jersey. *Id*. at ¶ 62-64.

Dunklin-Dorazio alleges similarly unpaid overtime hours and related behavior of Regeneron and MMI and its agents that Egan experienced. This includes denial of assistance from MMI, its refusal to endorse timesheets accurately, and retaliating against Dunklin-Dorazio for continually requesting the above issue be addressed. Dunklin-Dorazio estimated working 1,433 unpaid overtime hours to date. *Id*. at ¶ 99. As such, Dunklin-Dorazio alleges claims related to overtime and retaliation.

Additionally, Dunklin-Dorazio claims that Defendants harassed and intimidated her because she complained about lack of payment for overtime hours incurred. *Id*. at ¶¶ 157-205. Dunklin-Dorazio alleges that Cantarella and Regeneron retaliated against her by mocking her with embarrassing and derisive remarks to her co-workers. *Id*. at ¶¶ 203-205. At one point, Stieve referred her to

Dawn Ponico, MMI's Vice President of Human Resources for remedial assistance but the retaliation and overtime continued. *Id*. at ¶¶ 188-194.

Dunklin-Dorazio alleges she was entitled to paid sick leave, submitted a request in October 2020, but was denied by MMI. *Id*. at ¶¶ 213-215. Facts have not been supplied to explain the need for Dunklin-Dorazio's sick leave or its denial. Plaintiff Dunklin-Dorazio individually claims Defendants violated the New Jersey Paid Sick Leave Law ("PSLL"), N.J.S.A. § 34:11 D-2 *et seq*. and the New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 650, *et seq*. (*Id*. at ¶¶ 250-283). As such, the reasoning expressed above for Egan applies to Dunklin-Dorazio.

V.

Non-signatory Defendant Regeneron seeks to participate in the arbitration, arguing Plaintiffs' allegations and claims against MMI and Regeneron are identical and intertwined, thus concurrent arbitration would resolve all pending claims. (ECF No. 12).

Ordinarily, arbitration is between the parties who agreed to arbitrate in a written contract. Sometimes a non-signator may participate in the arbitration through the operation of contract principles. For example, the theory of equitable estoppel has been applied (1) "when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the

13

agreement"; and (2) a signatory may be bound to arbitrate with a non-signatory where there is a "close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediaries, S.A.S.*, 269 F.3d 187, 199 (3d Cir. 2001).

Another example is when third party beneficiary law compels arbitration of a non-signator. Often, the "close relationship" of the entities requires non-signatories to be bound to the arbitration clause under traditional principles of contract and agency law. *Id.* at 194-195; *see also Thomson–CSF, S.A. v. American Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir.1995). "[W]hether seeking to avoid or compel arbitration, a third party beneficiary has been bound by contract terms where its claim arises out of the underlying contract to which it was an intended third party beneficiary." *DuPont*, 269 F.3d at 195 (3d Cir.2001).

Here, the Complaint sets forth interrelated claims among MMI, Regeneron, Egan and Dunklin-Dorazio. Moreover, in the Complaint, Plaintiffs assert a "close relationship" between MMI and Regeneron as "joint employers," thereby recognizing the intended close relationship among the parties. (ECF No. 1, Exhibit

14

A Complaint at ¶ 71-74). As such, Regeneron is closely knit to the Egan and Dunklin-Dorazio agreements through MMI, and is subject to arbitration[1].

VI.

Ellen Stieve of MMI and Vincent Cantarella of Regeneron are employees of said companies. As such, they are included in the arbitration in such a capacity.

## ORDER

**THIS MATTER** having come before the Court on Defendants' motions to dismiss Plaintiff's complaint and compel arbitration (ECF Nos. 11 and 12) and the Court having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments and exhibits therein presented; and for good cause shown; and for all of the foregoing reasons,

**IT IS** on this 10th day of February, 2023,

**ORDERED** that Defendants' joint motions to dismiss Plaintiff's complaint and compel arbitration (ECF Nos. 11 and 12) are granted in part and denied in part. The Court grants the motion to compel arbitration, and denies the motion to dismiss the complaint as moot; and it is further;

---

[1] It is troublesome that MMI produced the Egan and Dunklin-Dorazio agreements, but failed to produce any agreement between it and Regeneron. If a MMI/Regeneron contract exists, it is questionable how it applies to this decision, especially in light of Regeneron's third party beneficiary status. See above. Obviously, any questions that arise will be brought to the arbitrator's attention.

**ORDERED** that the case is administratively stayed until such time as the arbitration is resolved.

s/*Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.